# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| **MARK DAVID CLOUD AND PATTI BRANDT CLOUD** | **CIVIL ACTION NO. 3:18-1070** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **MIKE STONE, LINCOLN PARISH SHERIFF IN HIS OFFICIAL CAPACITY, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Plaintiffs Mark David Cloud and Patti Brandt Cloud brought this lawsuit against

Defendants Mike Stone, Lincoln Parish Sheriff in his Official Capacity ("Sheriff Stone") and

Deputy Kyle Luker ("Deputy Luker") arising from an incident in which Plaintiffs' son, Joshua

Cloud, was shot and killed by Deputy Luker.[1]  Plaintiffs assert excessive force claims under 42

U.S.C. §§ 1983 and 1988, claims of wrongful death and survival actions under state law, and

claims of disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101,

*et seq.*

Pending before the Court  are the parties' cross-motions for summary judgment.

Defendants move for summary judgment on all claims against them, and Plaintiffs move for

summary judgment on "the issue of liability of . . . [Deputy] Kyle Luker on . . . [their] § 1983

claim and the state law tort claims and to grant summary judgment in favor of [P]laintiffs against

the [sheriff] on [P]laintiffs' state law claims.  [Doc. No. 65, p. 1].  For the following reasons,

Defendants' Motion for Summary Judgment [Doc. No. 50] is GRANTED, and Plaintiffs' Motion

---

[1]Plaintiffs originally brought suit against Lincoln Parish District Attorney John Belton as well, but have voluntarily dismissed those claims .  [Doc. No. 55].

for Summary Judgment [Doc. No. 65] is DENIED.  Plaintiffs' claims are DISMISSED WITH PREJUDICE.

## I.      Facts and Procedural History

Deputy Luker applied for employment with the Lincoln Parish Sheriff's Office in 2009. An electronic background check (including civil, criminal, and financial records) was conducted, and he received a conditional offer of employment.  After Deputy Luker satisfactorily completed physical health and fitness and psychological exams, the Sheriff's Office made a formal offer of employment to him.  He served a one-year probationary period, during which he completed the Louisiana P.O.S.T. Academy and became a certified peace officer pursuant to the law of the State of Louisiana.  He also underwent additional training with a field training officer.

Since that time, as do all deputies with the Lincoln Parish Sheriff's Office, Deputy Luker completed annual refresher training in accordance with P.O.S.T. standards and other training that is not required.  Prior to the incident giving rise to this lawsuit, Sheriff Stone does not recall and has no record of any formal complaint made against Deputy Luker.

On August 29, 2017, Joshua Cloud ("Cloud") was traveling on Interstate 20 ("I-20"), returning home to Tennessee after the summer working in Colorado.  Cloud was hearing impaired, but did not wear hearing aids.

On that date, Deputy Luker was observing traffic on I-20.  He observed Cloud traveling eastbound in a red truck with a camper.  Deputy Luker observed Cloud speeding near Simsboro, Louisiana.  Deputy Luker followed Cloud without activating his lights and/or siren until he exited I-20.  Deputy Luker also exited I-20 and continued to follow Cloud to the intersection of Highway 80 and Rose Street across from Simsboro High School.

At that time, Deputy Luker activated his lights and siren and conducted a traffic stop. They came to stop on Rose Street. During the traffic stop, Deputy Luker and Cloud communicated. According to Deputy Luker, he asked if Cloud had a driver's license, and Cloud replied "yes," but did not produce it. Deputy Luker then asked him to give it to him, and Cloud replied that "you didn't ask for it." [Doc. No. 65-6, p. 18]. Cloud then produced his license and other requested documentation. Deputy Luker issued Cloud a ticket for speeding.

However, Cloud disputed the ticket and refused to sign it. At that time, Deputy Luker returned to his vehicle and put his ticket book in the vehicle. He asked Cloud to step out of his truck. Cloud complied. Deputy Luker then attempted to arrest him. Deputy Luker ordered Cloud to turn around and place his hands behind his back. Cloud complied, and Deputy Luker placed the handcuff on Cloud's left wrist. However, when Deputy Luker attempted to secure Cloud's right wrist, Cloud made a quarter turn toward Deputy Luker and began arguing about the ticket. Deputy Luker ordered Cloud to give him the other wrist, but Cloud pulled away and turned fully around, so that his back was to the truck. Cloud did not tell Deputy Luker or otherwise indicate that he was hearing impaired or that he was having trouble understanding Deputy Luker.

Deputy Luker then stepped back and deployed his taser for two cycles or approximately two seconds. The taser did not incapacitate Cloud. The evidence indicates that Deputy Luker was positioned too closely to Cloud for the taser to work correctly and cause muscle contractions. Cloud pulled the taser probes from his chest and yelled. Deputy Luker then used his remote control to release his K-9, which had been inside his patrol unit. Cloud had turned

and had access to the open door of the vehicle.[2] Deputy Luker then grabbed Cloud around the waist and began attempting to activate his taser in drive stun mode by removing the cartridge and placing it on Cloud's left side somewhere around the rib cage. Deputy Luker and Cloud continued to struggle, sliding along the truck from the rear door to the open driver's side door of the truck. Cloud turned and went over the driver's seat with Deputy Luker continuing to attempt to use his taser (now on his right side) and telling Cloud to "stop." [Doc. No. 65-6, Luker Deposition, p. 25]. Cloud produced a black revolver from within the cab of the truck from underneath the steering wheel. Deputy Luker dropped his taser and attempted to gain control of the revolver, but the revolver discharged while Deputy Luker's hands were on it. Two shots were fired, one missing Deputy Luker and one going into his chest. Deputy Luker was in significant pain from the shot, although it was stopped by his vest.

During the struggle, Deputy Luker heard Cloud say, "I don't want to have to do this." [Doc. No. 50-9, Luker Declaration, ¶¶ 3, 4, & 32]; [Doc. No. 65-9, Exhibit 1601, State Police Interview Audio Recording].[3] Deputy Luker responded by telling him to just stop, but Cloud continued to struggle for control of the handgun. As the two men struggled, Deputy Luker's K-9 engaged Cloud, and Cloud let go of the revolver with one hand. Deputy Luker was able to get the revolver out of Cloud's hand and throw it behind him.

---

[2] [Doc. No. 65-3, Exhibits 1601 & 1603, recorded interview and transcript of interview of Deputy Luker ("[H]e turns his right side to the vehicle . . . He has access to the open door.")].

[3] At the time the Court reviewed the evidence in this matter, the audio recording provided by Defendants would not play on the Court's computer system. However, Plaintiffs also produced the audio recording, and the Court could listen to that audio recording. Therefore, the Court cites to Plaintiffs' recording.

Once Cloud was disarmed, Deputy Luker disengaged from Cloud, drew his own weapon and told Cloud to "get on the ground." [Doc. No 65-6, Luker Deposition, p. 31]. He saw Cloud's revolver on the ground and kicked it behind him.

Deputy Luker had his weapon trained on Cloud, and his K-9 remained engaged with Cloud. Deputy Luker radioed for assistance, advising that shots had been fired and that he was hit. [Doc. No. 50-1, Exhibit B-2, Audio Recording of Radio Traffic]. Deputy Luker did not shoot Cloud because he knew his backup would be en route, and he only had to hold out until they arrived. He continued to order Cloud to the ground, but Cloud did not comply. He did ask Deputy Luker to call off the K-9.

Quinton Crowe ("Crowe"), a janitor at Simsboro High School, was on a smoke break and witnessed and recorded part of the incident from across the street. He did not see the initial stop, but began observing the incident after he heard Deputy Luker deploy his taser. Crowe was "fidgeting" and also trying to contact the school while he was recording, so there are several gaps in the video where Deputy Luker and Cloud are not visible. [Doc. No. 65-18, Crowe Deposition, pp. 8, 20]. Crowe did not record the first shooting and could not see who fired the shots, though he did see Deputy Luker and Cloud were "wrestling" at the time. *Id.* at pp. 8, 12-13.

Crowe radioed the school to notify administrators and the School Resource Officer, Lincoln Parish Sheriff's Deputy Taff Watts, that there was an officer involved shooting. Crowe heard Cloud ask "what did I do?" or "why?" at the point that Cloud was engaged by the K-9 and after the first shots were fired. *Id.* at pp. 9, 22. He also observed, and the video demonstrates, that Cloud failed to comply with Deputy Luker's repeated orders to get on the ground. Deputy

Luker testified that he had stepped to the right, and the photographs and video demonstrate that he is close to Cloud.

However, then, according to Deputy Luker, Cloud was able to disengage from the K-9 and began to move past him. Deputy Luker knew Cloud's revolver was still on the ground behind him and believed that Cloud was moving to get to the weapon. Deputy Luker shot Cloud as he moved past Deputy Luker.

After Crowe radioed, Deputy Watts immediately began moving to the scene. It took Deputy Watts approximately a minute or two to get to the scene. [Doc. No. 76-3, Taff Watts Deposition, pp. 10-11]. Deputy Watts was close enough to see Deputy Luker and Cloud struggling, followed by some separation between them. He saw Joshua Cloud moving in the direction of his handgun and also believed that Cloud was going for the weapon. He heard the shots and arrived on scene only seconds later.

Crowe had been both watching and recording the incident. He "assumed" Cloud "bust[ed] a move," but had looked away and did not see or record Cloud's movement or when Deputy Luker shot Cloud. [Doc. No. 65-18, Crowe Deposition, pp. 22-23].

Cloud died at the scene.

After Deputy Watts's arrival, Deputy Luker was able to remove his ballistic vest and shirt. He was injured and bleeding, but his injuries were not life threatening.

Pursuant to common practice, the Louisiana State Police investigated the shooting. They took statements from Deputies Luker and Watts and Crowe, among others. They photographed the scene and collected the physical evidence, including Cloud's revolver, the shell casings from his weapon, and the bullet that struck Deputy Luker in the chest.

After reviewing all evidence and conducting forensic testing, the State Police determined that Deputy Luker was justified in the use of deadly force.[4]

During the pendency of the investigation, Deputy Luker was placed on administrative leave per policy for all deputies involved in a shooting. He also underwent initial and follow-up psychological evaluations by a third-party psychologist, and was cleared to return to duty.

Deputy Luker had no knowledge that Joshua Cloud suffered from hearing loss. Cloud communicated with Deputy Luker during the entirety of their interactions, even during their altercation, and never said that he had hearing loss or requested any accommodations.

## II.    Law and Analysis

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); see also Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson*

_____

[4]The investigation also revealed marijuana plants, packages of marijuana, marijuana infused "jerky," and thirteen bottles of moonshine in Cloud's truck.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id.

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In *Tolan v. Cotton*, 134 S.Ct. 1861 (2014), the Supreme Court stressed "the importance of drawing inferences in favor of the nonmovant" in qualified immunity cases. *Id.* at 1886. "If a district court credits evidence of the party seeking summary judgment but fails to properly acknowledge key evidence offered by the nonmoving party, it misapprehends the summary judgment standard." *Stout v. Vincent*, 717 F. App'x 468, 471 (5th Cir. 2018) (citing *Tolan*, 134 S. Ct. at 1867–68).

B.     **Section 1983 Claims Against Deputy Luker in his Individual Capacity**

Plaintiffs assert that Deputy Luker's actions were in violation of Cloud's civil rights because he used excessive force by employing the taser and by shooting Cloud. Defendants respond that Deputy Luker's force was not excessive and that, additionally, he is entitled to qualified immunity.

A plaintiff suing under § 1983 must "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citing *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)). A plaintiff may assert a § 1983 suit against a person in his or her individual or official capacity as well as against governmental entities. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

First, the Court considers Plaintiffs' claims against Deputy Luker in his individual capacity.

### 1. Excessive Force

"When a plaintiff alleges excessive force during an investigation or arrest, the . . . right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan,* 134 S.Ct. at 1865 (citing *Graham*, 490 U.S. at 394); *see also* U.S. Cont. amend. IV ("The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause. . . ."). A Fourth Amendment excessive force claim presents the court with a legal question of whether the officer's conduct was reasonable.

To establish an excessive force claim, a plaintiff must show "(1) [an] injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

"Excessive force claims are necessarily fact intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). Three factors are particularly important when examining the state's interest, (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 394-95. However, "the use of force must be evaluated '**from the perspective of a reasonable officer on the scene**, rather than with the 20/20 vision of hindsight.'" *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (quoting *Poole*, 691 F.3d at 627) (emphasis added) (other citations omitted). The Court's "inquiry is 'whether the officer['s] actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (citing *Graham*, 490 U.S. at 397).

In this case, Plaintiffs contend that Deputy Luker used excessive force (1) when he tasered Cloud and (2) when he shot Cloud, causing his death. The Court considers each claim in turn.

### a. Taser Incident

Defendants moves for summary judgment on Deputy Luker's use of a taser on Cloud. They argue that the use of the taser was not excessive force, but was reasonable under the circumstances.

Plaintiffs respond that there are three considerations which render Deputy Luker's use of

the taser excessive and clearly unreasonable:  (1)  Cloud's turn towards Deputy Luker was to "in order to read his lips"; (2) Deputy Luker has not suggested that he "felt threatened" rather than angered or frustrated; and (3) Deputy Luker not only deployed the taser, but released his K-9 and drove the taser into Cloud's body.

Viewing the evidence from the perspective of a reasonable officer and considering those factors deemed particularly important by the Supreme Court, the Court recognizes that a traffic stop is not a severe crime.  While Cloud was subject to arrest under Louisiana law for refusing to sign his ticket, that fact does not convert the traffic stop into a serious crime.  Thus, this factor weighs in favor of finding that Deputy Luker's use of the taser was excessive.

However, the Court must also consider the other important factors as to whether Cloud was a threat to Deputy Luker's safety and was resisting arrest or attempting to flee, as well as the other particular facts and circumstances leading up to Deputy Luker's use of force.  The immediacy of the danger "is considered from the perspective of the officer, and the suspect's subjective state of mind is not relevant."  *Pena v. City of Rio Grande City, Texas*, 398 F. Supp. 3d 127, 152 (S.D. Tex. 2019) (citing *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007); *United States v. Serrata*, 425 F.3d 886, 905 (10th Cir. 2005); *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997)).

Deputy Luker testified without contradiction that Cloud refused to comply with his command to allow him to handcuff him.  Instead, after initially complying and allowing Deputy Luker to cuff one wrist (a fact that is verified by the video where the cuff can be seen),  he then turned to Deputy Luker partially, continuing to argue the ticket.  Then he not only refused to allow himself to be handcuffed, but turned fully around to face Deputy Luker with his back to his

vehicle.  At this point, the facts show that, as Defendants point out, Cloud was turned to "fully square off" with Deputy Luker, [Doc. No. 70, p.1].  Although it was day time, Deputy Luker did not have back up, was alone with Cloud, who had a handcuff attached to one wrist, and the driver's truck door was open.  Under these circumstances, the Court  finds that a reasonable officer on the scene would have viewed Cloud as a threat.

With regard to the third important factor, the Fifth Circuit has "previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."  *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir.), cert. denied sub nom. *City of Fort Worth, Tex. v. Darden*, 139 S. Ct. 69, 202 L. Ed. 2d 23 (2018) (citing *Ramirez v. Martinez*, 716 F.3d 369, 377–78 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). Plaintiffs argue that this factor weighs in favor of a finding of excessive force because Cloud was not actively resisting arrest, but was merely turning towards Deputy Luker to read his lips because of his hearing impairment.  While the evidence must be viewed in the light most favorable to the non-movant, the Court cannot consider speculation and conjecture.  Any suggestion that the reason Cloud turned toward Deputy Luker to read his lips is just that. There is only one witness to the traffic stop prior to the time Deputy Luker deployed his taser:  Deputy Luker himself.  Crowe admittedly did not begin observing the traffic stop or recording video until he heard the taser.[5]  Plaintiffs have offered a declaration from Plaintiff Mark David "Rusty"

---

[5]Crowe testified:

 I was located in the track parking lot, right in front of the buses.  And as I was out there on a smoke break, I didn't actually see the officer pull the man over, but I heard the taser, and **once I heard the taser, I got up and I began to observe.**

Cloud, Cloud's father, that Cloud was hearing impaired,[6] but none of the information provided in that declaration can raise a genuine issue of material fact for trial to discredit Deputy Luker's testimony that he and Cloud communicated throughout the stop, that Cloud never told Deputy Luker that he could not hear or that he was turning around to read Deputy Luker's lips, and that Cloud continued to argue the ticket when he faced Deputy Luker and failed to turn back around when told to do so by Deputy Luker. While no one can know Cloud's subjective intent, it is not his intent that must be determined. Rather, the question is whether, objectively, based on the available evidence, a reasonable officer would have believed Cloud was actively resisting arrest.[7] The Court answers that question in the affirmative.

---

[Doc. No. 65-18, Crowe Deposition, pp. 6-7 (emphasis added)]. He further explained that "[w]hen I looked up, I saw the officer and the guy in confrontation." *Id.* at p. 8. He described Deputy Luker and Cloud as "[w]restling with each other." *Id.*

[6]The declaration includes a number of anecdotes and historical information offered for their truth about Cloud's hearing issues, but Plaintiffs did not produce any medical records, an audiogram, or other objective evidence quantifying Cloud's hearing loss. Likewise, Plaintiffs offered the declaration of Cloud's former boss, Wayne Rader, but the only evidence he provides on Cloud's hearing loss is that Cloud asked him if he "had ever hired anyone that didn't hear well." [Doc. No. 76-4, Wayne Rader Declaration]. Such a declaration, ignoring the hearsay it contains, does not provide any evidence whatsoever that Deputy Luker knew that Cloud had a hearing loss.

[7]The Fifth Circuit has explained:

Although [the plaintiff] is correct that, based on his testimony and the ambiguities in the video, a reasonable jury might find that he was not actually resisting arrest, that is not the proper inquiry in this appeal. A court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts. *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (emphasis added). "For that reason, when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts." *Id.*

*Griggs*, 841 F.3d at 313–14.

Additionally, the objective facts show that Deputy Luker did not deploy the taser when Cloud made an initial quarter turn towards him.  Instead, Deputy Luker instructed him to place his hands behind his back and allow himself to be handcuffed.  Cloud then disregarded this command and made a further turn to face Deputy Luker.  Only at that time did Deputy Luker deploy the taser.  Deputy Luker recalls using the taser for approximately two seconds.  Under the circumstances and viewed in the appropriate light, the Court finds that Deputy Luker's use of the taser was not excessive.

However, Plaintiffs argue that Defendants have failed to consider Deputy Luker's second use of the taser in a drive stun maneuver and the release his K-9, as an additional show of excessive force.  Plaintiffs' argument ignores Deputy Luker's testimony that Cloud had not been injured by the taser (although the taser would certainly cause pain) and had removed the probes with an expression of anger that Deputy Luker characterized as "pure rage."  [Doc. No. 50-9, Luker Declaration; Doc. No. 65-9, State Police Interview of Luker; Doc. No. 65-10, Transcript of State Police Interview of Luker ("A loud yell and the only way to describe it would be just pure rage.")].[8]  Cloud did not then become compliant and allow Deputy Luker to handcuff him, but continued to resist arrest.  At that point, Deputy Luker could no longer use the taser probes, which Cloud had removed, but only had the option of using the taser in a drive stun maneuver.  Deputy Luker sought to gain control of Cloud by use of the taser in this method with the help of his K-9.  Again, under the particular facts of this case, the Court finds that Deputy Luker's use of the taser (and of his K-9) was not excessive.  Accordingly, Defendants' Motion for Summary

---

[8] Crowe did not hear Cloud "fussing or getting angry" from across the street, but confirmed the struggle between Deputy Luker and Cloud and that Cloud was not compliant. [Doc. No. 65-18, Crowe Deposition, p. 15].

Judgment on Plaintiffs' excessive force claim against Deputy Luker based on his use of the taser is GRANTED.

### b. Use of Deadly Force

Plaintiffs also contend that Deputy Luker's use of deadly force was excessive under the facts and circumstances.

"An officer's use of deadly force is justified when the officer reasonably perceives an immediate threat of serious bodily harm or death to themselves or to others." *Collie v. Barron*, 747 F. App'x 950, 953 (5th Cir. 2018) (citing *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (internal quotation marks and citation omitted).

In this case, Deputy Luker employed deadly force only after Cloud retrieved a revolver from his truck; he and Cloud had struggled over the revolver; two shots had been fired from the revolver; and one shot had actually fired into Deputy Luker's chest. Even then Deputy Luker did not immediately return fire and shoot Cloud. With the aid of the K-9, Deputy Luker was able to get the revolver away from Cloud and separate. He then drew his own firearm and held it on Cloud while his K-9 engaged with Cloud, and he awaited back up. Deputy Luker and Crowe consistently testify that he instructed Cloud to get on the ground, and he did not do so. Finally, Deputy Luker and Deputy Watts, the only witnesses to the fatal shooting, both testified that Cloud began moving past him and in the direction of the revolver. Believing Cloud was attempting to retrieve that revolver, Deputy Luker shot him as he moved past.

Plaintiffs make much of the video by Crowe. Indeed, courts may give greater weight to video recordings taken at the scene. *See Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we

assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.") (citing *Scott v. Harris*, 550 U.S. 372 (2007)). In this case, however, the video is only of limited value. The video does not begin until after Deputy Luker has employed the taser, it was taken from across the street, and much of the video is obscured when Crowe is moving around or while he was attempting to notify the school of the incident. Although Plaintiffs contend that the video depicts when Deputy Luker is shot (because his body rises up approximately 9 seconds into the video), they admit that it is not clear who fired the shots. The Court finds nothing in the video or in the testimony of Crowe, the videographer, to support Plaintiffs' speculation that Deputy Luker, not Cloud, was the one who caused the revolver to fire, somehow shooting himself. Plaintiffs' theory based on pictures of Deputy Luker's hands versus those of Cloud's hands is nothing more than that—a theory. As they admit, no testing of Cloud's hands were performed, and Deputy Luker has testified unequivocally and consistently that Cloud fired the revolver while Deputy Luker's hands were on the barrel.

Further, even if Plaintiffs' theory were correct that Deputy Luker was responsible for the shots, there is no evidence to dispute Deputy Luker's account that he *believed* Cloud had shot him. The fact that Deputy Luker used the terminology "shots fired" when alerting the Sheriff's Department, rather than presumably saying "he shot me," simply does not discredit his testimony. Regardless of how the shooting occurred, Deputy Luker was aware that Cloud's revolver was loaded, and he had already suffered a gunshot from that revolver.

Plaintiffs also contend that Deputy Luker's use of deadly force was excessive based on the theory that Cloud, who had asked Deputy Luker to call off his K-9, was not moving toward

the revolver, but away from the dog.  Of course, this is possible, as no one but Cloud could know with certainty what he intended.  However, as the case law instructs, the Court must evaluate the evidence from the perspective of a reasonable officer on the scene.  The Court cannot find that Deputy Luker's use of deadly force was clearly unreasonable when he had already been shot, the loaded revolver was behind him, and Cloud failed to heed his multiple commands to get on the ground, but moved in the direction of the revolver.  Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' excessive force claim based on Deputy Luker's use of deadly force must be granted.

### 2.  Qualified Immunity

In the alternative, Defendants move for summary judgment based on a qualified immunity defense.

Qualified immunity is a doctrine that recognizes the difficulty of second guessing an officer's decisions in the field from the comfort of the judge's chambers. In that sense, it affords officers with ample room to make reasonable but mistaken legal judgments. *Rodriguez v. Bexar Cnty. Hosp. Dist.*, 14-861, 2015 WL 77600209 at *21 (W.D. Tex. Nov. 30, 2015) (citations omitted). Importantly, once asserted by the defendant, the burden shifts to the plaintiff to show that the defense is inapplicable. *See McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013).

Courts employ a two-step procedure to gauge the applicability of qualified immunity. These steps can be reviewed in any order, but the underlying inquiries are whether the plaintiff has alleged facts sufficient to state a constitutional violation and whether, at the time of the incident, the contours of the right were clearly established so that every reasonable officer would understand what he was doing violates that right. *Cutler v. Stephen F. Austin State Univ.*, 767

F.3d 462, 471 (5th Cir. 2014). On the other hand, the clearly established prong does not

necessarily require a case "'directly on point.'" *See Morgan v. Swanson*, 659 F.3d 359, 372 (5th

Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Still, precedent must have

placed the pertinent constitutional issue beyond debate. *Ashcroft*, 563 U.S. at 741. Indeed, the

qualified immunity defense will protect all but the "plainly incompetent or those who knowingly

violate the law." *Malley v. Briggs*, 475 U.S. 335, 340 (1986).

The second prong of the analysis asks whether the right at issue was clearly established at

the time of the allegedly unconstitutional conduct. Courts have held that an officer has fair notice

of the factors used in gauging whether force is excessive in the constitutional context. *See Autin*,

174 Fed. App'x. 183, 186. ("when discussing the law of excessive force, the Supreme Court and

this circuit typically emphasize the three factors discussed above. A reasonable officer is charged

with knowing that, as clearly established law, these are factors that tend to indicate whether the

use of force is appropriate."); *see also Wharton*, 477 Fed. App'x. at 263; *Rakestrau v. Neustrom*,

11-1762, 2013 WL 1452030 at *10 (W.D. La. Apr. 8, 2013) (same).

> In excessive force cases, "the second prong of the analysis is better understood as
> two separate inquiries: whether the allegedly violated constitutional rights were
> clearly established at the time of the incident; and, if so, whether the conduct of
> the defendants was objectively unreasonable in light of that then clearly
> established law." *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005)
> (citations and quotations omitted). "If officers of reasonable competence could
> disagree as to whether the plaintiff's rights were violated, the officer's qualified
> immunity remains intact." *Id.*

*Griggs*, 841 F.3d at 313.

As to the first prong, the Court has found that there is no constitutional violation in this

case, and, thus, alternatively, Deputy Luker is entitled to qualified immunity based on Plaintiffs'

failure to establish the first prong on both Deputy Luker's use of the taser and his use of deadly force.

With regard to Deputy Luker's use of deadly force, even assuming *arguendo* there were a constitutional violation, Plaintiffs have failed to make a showing on the second prong as well.

"The law is clearly established if there is factually similar, controlling case law from [the Fifth Circuit] or the Supreme Court." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 665-666 (2012)). In multiple cases, the Fifth Circuit has found that an officer was entitled to summary judgment on a qualified immunity defense when he reasonably believed that a suspect had a weapon, even when it was ultimately determined that the suspect did not actually have a weapon.

In *Ontiveros v. City of Rosenberg, Texas*, 564 F.3d 379 (5th Cir. 2009), the officer believed that the decedent had retrieved a weapon and used deadly force. Even though no weapon was ultimately discovered, the Fifth Circuit held that the police officer's use of deadly force was reasonable under the circumstances because the officer observed the suspect reaching into his boot at chest level and believed the suspect was reaching for a weapon. *Id.* at 382.

Similarly, in *Reese v. Anderson*, 926 F.2d 494, 500-501 (5th Cir. 1991), the Fifth Circuit held that a police officer was justified in using deadly force to defend himself when a passenger in a vehicle repeatedly reached below a police officer's sight line in defiance of the police officer's orders, and the officer could reasonably have believed that the passenger had retrieved a gun and was about to shoot, even where the passenger is later determined to be unarmed. In finding that the officer had acted reasonably, the Fifth Circuit relied on the following facts:

> Anderson ordered the vehicle's occupants to raise their hands. Clear
> communication was difficult because of the siren noise, a situation for which

Anderson is not to blame; nonetheless, the vehicle occupants clearly understood Anderson's commands and initially complied. Then Crawford repeatedly reached down in defiance of Anderson's orders. At least twice, Crawford reached below Anderson's sight line. The second time, Crawford tipped his shoulder and reached further down. Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that Crawford had retrieved a gun and was about to shoot. That is, an officer would have probable cause to believe that . . . the suspect pose[d] a threat of serious physical harm. Anderson had repeatedly warned Crawford to raise his hands and was now faced with a situation in which another warning could (it appeared at the time) cost the life of Anderson or another officer. Under such circumstances, an officer is justified in using deadly force to defend himself and others around him. Accordingly, the individual defendants are entitled to summary judgment as a matter of law. . . . Also irrelevant is the fact that Crawford was actually unarmed. Anderson did not and could not have known this. The sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm.

*Reese*, 926 F.2d 494, at 500-501(citations omitted).

In this case, Deputy Luker had already been shot once, was aware that a loaded revolver was located behind him, Cloud had refused to heed his multiple commands to get on the ground, and Cloud moved in the direction of the revolver. Deputy Luker reasonably believed he was in danger and had only moments to react. Even if Deputy Luker violated Cloud's constitutional rights to be free from the use of excessive force, the Court finds that his conduct was not objectively unreasonable in light of the clearly established case law. Accordingly, Defendants' Motion for Summary Judgment must be granted on this alternative basis.

**C.      Section 1983 Claims Against Sheriff Stone**

Plaintiffs do not allege that Sheriff Stone was personally involved in the incident leading to Cloud's injury and death, but assert a claim against him only in his official capacity. Defendants contend that Sheriff Stone is entitled to dismissal of these claims for multiple reasons.

20

First, the Court has found that Deputy Luker did not use excessive force in violation of the Fourth Amendment, and, thus, there was no constitutional deprivation to Cloud. For this reason alone, Sheriff Stone is entitled to summary judgment on Plaintiffs' claims under § 1983. *Assuming arguendo* that there was a constitutional violation, Plaintiffs have failed to make out a claim against Sheriff Stone.

An official capacity suit is the equivalent of a suit against the entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Brandon v. Holt*, 469 U.S. 464, 471-472 (1985); *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991); *McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 784-85, (1997)[3]; *Burge v. St. Tammany Parish,* 187 F.3d 452, 466 (5th Cir. 1999). However, the proper official to sue in his official capacity to impose liability upon a local governmental entity is the official with final policymaking authority for the entity under state or local law. *See Burge*, 187 F.3d at 468–70 ("The Supreme Court's cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are policymakers for the local government in a particular area, or on a particular issue, and that our inquiry is dependent on an analysis of state law.") (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)).

---

[3]As the Supreme Court explained,

 a suit against a governmental officer "in his official capacity" is the same as a suit "'against [the] entity of which [the] officer is an agent,'" *Kentucky. . .* , 473 U.S. . . [at] 165 . . . (quoting *Monell v. New York City Dept. of Social Servs*., 436 U.S. 658, 690, n. 55 . . .(1978) and that victory in such an "official-capacity" suit "imposes liability on the entity that [the officer] represents," *Brandon . . .* , 469 U.S. . . [at] 471 . . . .

*McMillian,* 520 U.S. at 785 n. 2.

Sheriff Stone is a final policy maker for Lincoln Parish. However, it is not enough for Plaintiffs to show that Sheriff Stone is a final policy maker. They must also show that a government policy or custom caused the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Board of Cnty. Comm'nrs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 483 n. 10 (5th Cir. 2000). "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. . . .[A] municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

A policy may be a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the government's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Burge*, 336 F.3d at 369.

> It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the [governmental entity]. The plaintiff must also demonstrate that, through its deliberate conduct, the [governmental entity] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the . . . action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the . . . action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404.

"Proof of [governmental] liability sufficient to satisfy Monell requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214,

22

227 (5th Cir. 2009) (There must be "proof of (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom.").

> The "official policy" requirement may be met in at least three different ways: [*Bryan County,* 520 U.S. ] at 406–08. . .. (1) "[W]hen the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Id.* at 417 . . . (Souter, J., dissenting). . . ; (2) Where no "official policy" was announced or promulgated but the action of the policymaker itself violated a constitutional right. *Bryan County*, 520 U.S. at 417–18, 117 S.Ct. 1382 (Souter, J., dissenting). . .; and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378, 390 1989] . . . ("Only where a municipality's failure to train its employees ... evidences a 'deliberate indifference' to the rights of its inhabitants can ... a shortcoming be ... city 'policy or custom'... actionable under § 1983.").

*Burge v. Par. of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999). "The 'moving force' inquiry requires a plaintiff to make two showings: causation and culpability." *Mason*, 806 F.3d at 280 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, (1997)). This inquiry imposes a causation standard higher than "but for" causation. *Id.* (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)).

In this case, Plaintiffs contend, under the third method, that Sheriff Stone is liable for negligent hiring, failure to train, failure to supervise, and negligent retention. With regard to training and hiring claims, "[s]uch a showing requires proof that (1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy, and (3) the inadequate hiring or training policy directly caused the plaintiff's injury." *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (citing *Canton*, 489 U.S. at 385–87; *Benavides v. County of*

23

*Wilson*, 955 F.2d 968, 972 (5th Cir. 1992)); *see also Ratliff v. Arasas Cnty., Tex.,* Likewise,

"policymakers who fail to supervise and to discipline their police officers, acting with deliberate

indifference to the citizens' rights, could create municipal liability if the lack of supervision then

caused a deprivation." *Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004); *see*

*also Smith v. Blue*, 67 F. Supp. 2d 686, 689 (S.D. Tex. 1999) ("The demonstration of a failure to

train, or improper hiring, retention, and supervision, may be sufficient to establish such a policy

or custom.") (citing *Canton*, 489 U.S. at 387; *Bryan Cnty.*, 520 U.S. 397, 117 S.Ct. 1382, 1388–

89).

   However, Plaintiffs have failed to present evidence of inadequate hiring, training,

supervision, or retention amounting to deliberate indifference, or that any such policy or custom

was the moving force behind the alleged constitutional violations.  Deputy Luker was subjected

to both physical and mental examinations prior to his employment, he is P.O.S.T. certified, and

he has continued to receive appropriate training, both required and additional training, during his

tenure.  According to Sheriff Stone's unchallenged declaration, he does not recall and has no

record of any formal complaint made against Deputy Luker.

   Plaintiffs cite to Deputy Luker's failure to disclose his diagnosis of post-traumatic stress

disorder following his military service,  some personality issues identified in his pre-employment

psychological evaluation, and conclusorily states that Deputy Luker "suffers serious medical and

psychological problems."  [Doc. N. 67-4, p. 8].  An employee's failure to disclose a

psychological or medical issue is not attributable to a policy of Sheriff Stone or the Lincoln

Parish Sheriff's Office.  Instead, regardless of any such failure, all potential employees,

including Deputy Luker, undergo both physical and psychological evaluations by qualified

professionals before a final offer of employment is made. Further, while certain criticisms may have been made in Deputy Luker's psychological evaluation, that professional ultimately approved Deputy Luker's employment. Likewise, medical records of "sleep problems" do not show that Sheriff Stone was deliberately indifferent to Deputy Luker's physical or psychological condition. [Doc. No. 67-4, p. 9 & p. 9 n. 15 (citing Exhibit 1541, Deputy Luker's redacted medical records)].

Plaintiffs also speculate that a prior shooting by Deputy Luker was "even more of a white-wash than the 'investigation' in this case" and that Deputy Luker is a "sick" person who will shoot more people if he is not "taken off the streets." [Doc. No. 67-4, pp. 8-9]. Neither Plaintiffs' speculation nor counsel's inflammatory rhetoric suffices to raise a genuine issue of material fact for trial.

Additionally, Plaintiffs have failed to raise a genuine issue of material fact for trial that any policy or custom of Sheriff Stone or the Lincoln Parish Sheriff's Office was the moving force behind Cloud's injury and death.[9]

For all of these reasons, Sheriff Stone is entitled to summary judgment on Plaintiffs' § 1983 official capacity claim against him.[10]

---

[9] Although Plaintiffs suggest that additional discovery could help them prove their case, discovery was ordered by the Magistrate Judge in November, and no further evidence has been forthcoming, despite post-discovery briefing.

[10] Plaintiffs' Complaint and Amended Complaint appear to assert an individual capacity claim against Deputy Luker. To the extent that Plaintiffs asserted an official capacity claim against Deputy Luker, there is no basis for relief. There are no facts to support a finding that Deputy Luker is a final policymaker for Lincoln Parish. Additionally, for the reasons discussed with regard to Sheriff Stone, Plaintiffs have failed to raise a genuine issue of material fact for trial that Cloud's injury and death were the result of an official policy or custom. Therefore,

**D.     State Law Claims**

Plaintiffs also assert state law claims of excessive force, for the wrongful death of their son, and losses Cloud could have claimed if he had survived (a survival action).  Defendants argue that Plaintiffs' state law claims should also be dismissed.

"[E]xcessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances. This has been widely recognized by this court, Louisiana federal district courts, and the Louisiana Supreme Court." *Shepherd on behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (citing *Deville v. Marcantel*, 567 F.3d 156, 172 (5th Cir. 2009) ("Louisiana's excessive force tort mirrors its federal constitutional counterpart. ... 'Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case[.]' ... These considerations are sufficiently similar to the Graham factors that our decision on this claim mirrors our decision of plaintiffs' § 1983 excessive force claim." (quoting *Kyle v. City of New Orleans*, 353 So.2d 969, 973 (La. 1977))); *Reneau v. City of New Orleans*, No. 03-1410, 2004 WL 1497711, at *4 (E.D. La. Jul. 2, 2004) ("Under Louisiana law, the same standard is used in analyzing a state law claim of excessive force as a constitutional claim, namely reasonableness under the circumstances. . . . As the Court has found that the officers acted reasonably under the circumstances, the Plaintiffs state law claims must fail as well."); *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 323 (La. 1994) (stating that "[t]he reasonableness test we employed in *Kyle* is

---

Defendants are entitled to summary judgment on any such official capacity claim against Deputy Luker.

based upon the text of the Fourth Amendment to the United States Constitution[,]" and citing *Graham* in a footnote)).

Plaintiffs' state law claims for wrongful death are brought pursuant to Louisiana Civil Code article 2315.2, and their survival action is brought pursuant to Louisiana Civil Code article 2315.1. To successfully bring such a claim, a plaintiff must prove a duty, breach of that duty, cause-in-fact, proximate cause, and actual damages. *See Rombach v. Culpepper*, 2018 WL 1202556, *6 (E.D. La. 2018) (citing *Brown v. Lee*, 94-104, p.3 (La. App. 5 Cir. 7/13/94); 639 So. 2d 897, 898-99).

For the reasons previously stated, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact for trial that Deputy Luker's actions in tasing and then shooting Cloud were excessive under the circumstances. In reaching that determination, the Court has found that Deputy Luker's actions were not objectively unreasonable under the facts and circumstances, even viewed in the light most favorable to Plaintiffs. Accordingly, Defendants are also entitled to summary judgment on Plaintiffs' state law excessive force, wrongful death, and survival claims. Plaintiffs' Motion for Summary Judgment on liability as it relates to these claims must be denied.

### E. ADA Claim

Plaintiffs also assert that Cloud was disabled because of his hearing impairment, Deputy Luker violated his rights under the ADA, and Deputy Luker's actions are attributable to his employer, Sheriff Stone.[11]

---

[11] Plaintiffs also argued in their opposition memorandum, [Doc. No. 67-4, p. 6] that there was outstanding discovery related to this claim and that Defendants had been ordered to respond to this discovery by November 15, 2019. However, that date has passed, there is no indication

27

Defendants argue that Deputy Luker had no knowledge of Cloud's hearing impairment and that, alternatively, Deputy Luker did not have a duty to make accommodations for Cloud in exigent circumstances.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 234–35 (5th Cir. 2017) (quoting same). "These provisions allow individuals to sue local governments for disability discrimination committed by police in non-exigent circumstances." *Windham*, 875 F.3d at 235 (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 570–71, 574–76 (5th Cir. 2002); *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000)). To establish a violation of Title II, "a plaintiff must prove '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'" *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (citations omitted) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).

However, with regard to the third prong, it is a "widely accepted principle that intent requires that the defendant at least have actual notice of a violation." *Miraglia*, 901 F.3d at 574–75. Thus, "[a] critical component of a Title II claim for failure to accommodate . . . is proof that

---

that Defendants failed to provide the discovery as ordered, and the parties have engaged in further briefing since that time.

'the disability and its consequential limitations were known by the [alleged offender].'"

*Windham*, 875 F.3d at 236 (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015). "[B]ecause the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms." *Windham*, 875 F.3d at 236–37 (internal citations, quotations, and alterations omitted).

In this case, there is no evidence Deputy Luker knew or had any reason to know that Cloud had a hearing impairment, even if that impairment rose to the level of a disability. Deputy Luker testified that he and Cloud were communicating during the traffic stop, and Cloud never informed him or otherwise indicated that he was unable to hear or understand Deputy Luker. Plaintiffs' only evidence to contradict Deputy Luker's testimony is a video of Cloud speaking which they contend demonstrates that anyone would know that he was hearing impaired. However, the video was played for Deputy Luker, he denies that he would have known that Cloud was hearing impaired, and, more importantly, he denies that, at the time of the incident, he had any knowledge that Cloud was hearing impaired.[12] Thus, Plaintiffs have not raised a

---

[12] The Court, too, has reviewed the video and finds that it does not raise a genuine issue of material fact for trial that Deputy Luker's testimony would be discredited by a reasonable jury. This is not a video taken at the scene, but a video presentation made by Cloud during his senior year at the University of Alabama. Although the Court recognizes some difference with Cloud's speech at the beginning of the video, the Court cannot say that it raises a genuine issue of material fact for trial whether Deputy Luker's testimony would be discredited by any reasonable juror. In fact, the video demonstrates that he communicated with fellow students in a way that would not indicate to those students that he was hearing impaired. This is not a question of the weighing of evidence, but whether the evidence presented raises a genuine issue of material fact for trial as to Deputy Luker's lack of knowledge. The Court has found that it does not, and the video does not change that conclusion.

genuine issue of material fact for trial on this claim.[13]  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' ADA claim.

## III.     CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.  Plaintiffs' claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 23rd day of January, 2020.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE

---

[13] Given this conclusion, the Court need not reach Defendants' alternative argument on exigency.

30